**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
─────────────────────────────────

**COLLEEN T. PULEO,**

                                    **Plaintiff,**

        **v.**                                                    **6:20-cv-1593**

**MASONIC MEDICAL RESEARCH INSTITUTE;**
**JOHN S. ZIELINSKI; MARIA I. KONTARIDIS,**

                                    **Defendants.**
─────────────────────────────────

**THOMAS J. McAVOY,**
**Senior United States District Judge**


**DECISION & ORDER**

**I.      INTRODUCTION**

        Plaintiff Colleen T. Puleo ("Plaintiff") commenced this employment discrimination

action against Defendants Masonic Medical Research Institute ("MMRI"), John S.

Zielinski, and Maria I. Kontaridis (collectively, "Defendants").  Plaintiff claims that she

was discriminatorily and retaliatorily terminated because of her age and sex in in

violation of the Age Discrimination in Employment Act ("ADEA"), Title VII of the Civil

Rights Act of 1964 ("Title VII"), and the New York State Human Rights Law ("NYSHRL").

        Defendants move for summary judgment, ECF No. 41, which Plaintiff opposes,

ECF No. 44, Defendants file a reply, ECF No. 52, and Plaintiff files a sur-reply, ECF No.

53.  For the reasons that follow, Defendants' motion is granted.

**II.     STANDARD OF REVIEW**

        The parties have evinced their understanding of the well-settled standards for

deciding summary judgment motions in Title VII, ADEA, and NYSHRL discrimination

and retaliation actions, including application of the three-part burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973). Therefore, these standards will not be repeated.

Suffice it to say that where, as here, the intent of a party is in question but there is no direct evidence of discrimination, the Court must carefully examine the reasonable inferences that could be drawn from the totality of the circumstantial evidence and be cautious about granting summary judgment. *Schiano v. Quality Payroll Sys.,* 445 F.3d 597, 603 (2d Cir. 2006).  Nonetheless, "[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Abdu–Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 466 (2d Cir.2001); *see Schiano,* 445 F.3d at 603 ("[S]ummary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact.") (quoting *McLee v. Chrysler Corp.,* 109 F.3d 130, 135 (2d Cir.1997)).

## III.    BACKGROUND[1]

### A. The Masonic Medical Research Institute

MMRI is an internationally recognized biomedical research institute located in Utica, New York. MMRI's primary mission is to conduct high quality biomedical and clinical research focused on cultivating knowledge and understanding of diseases, medical treatments, and cures.  Much of the research at MMRI is conducted using animals.

---

[1] Where not indicated otherwise, the following facts are taken from Defendants' Statement of Material Facts ("Def. SMF") to which Plaintiff has admitted or failed to supply sufficient opposition. The Court views all facts in the light most favorable to the nonmoving party, but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris,* 550 U.S. 372, 127 S. Ct. 1769, 1776, 167 L.Ed.2d 686 (2007).

During the latter half of 2017, MMRI began a substantial capital improvement project to renovate and modernize its laboratory space. Plans for the renovation included the build out of new, state of the art laboratories, a full-barrier small animal vivarium, and an updated large animal facility. Initial plans anticipated that both the small and large animal facilities would be located on the third floor of the Institute. However, as planning was underway, it became apparent that the third floor could not support the needs and requirements of both a large and small animal facility.  This required MMRI to pivot, reimagine the construction plan, and complete the renovation in phases.

Construction of the small animal vivarium was completed in the summer of 2018. MMRI did not house any animals—large or small— at MMRI while construction was underway.  Plaintiff indicates, however, that dogs for MMRI were being housed off-site and that she "had to do the paperwork for them for MMRI." Puleo Aff., ECF No. 44-5,  ¶ 24.  Nevertheless, there is no dispute that from approximately June 2017 through August 2018, there were no animals at MMRI.

In addition to the physical reconstruction of MMRI's laboratory and animal spaces, on November 1, 2017, MMRI announced its appointment of Maria I. Kontaridis, Ph.D. ("Dr. Kontaridis") as its Director of Research.  Dr. Kontaridis officially started as the Director of Research on January 1, 2018. Prior to her official start date, Dr. Kontaridis worked for MMRI as a part-time consultant from approximately October 2017 until January 1, 2018. In her capacity as a consultant, Dr. Kontaridis advised MMRI on the design plan for the laboratory and animal facilities. During this time and until

3

approximately July 2018, Dr. Kontaridis primarily worked remotely from the Boston area, where she lived prior to moving to Utica.

Dr. Kontaridis also played a significant role in the strategic decision to move toward a small animal model of research. Defendants contend that this decision was based in large part on the recognition that the use of small animals – primarily mice – is best practice and industry standard in the medical research community. Furthermore, Dr. Kontaridis' own research is conducted using transgenic or genetically modified mice. Dr. Kontaridis' mice were the first animals reintroduced at MMRI after completion of the small animal facility.  Dr. Kontaridis maintains a colony of transgenic mice containing several different genetic lines; each line is valued at $50,000 to $100,000. Defendants contend that the appointment of Dr. Kontaridis as Director of Research was instrumental in MMRI's effort to modernize its approach to research and transition from a large to small animal model.

At the time of Dr. Kontaridis' appointment, John S. Zielinski ("Mr. Zielinski"), was MMRI's Chief Financial Officer and Vice President of Administration.  As Chief Financial Officer and Vice President of Administration, Mr. Zielinski was responsible for all aspects of the Institute with the exception of research and scientific endeavors.

**B. Plaintiff's Employment at MMRI**

Plaintiff was hired by MMRI in 1989 as Animal Care Administrator.  At all times, Plaintiff was an at-will employee. As Animal Care Administrator, Plaintiff's position revolved around caring for the animals present at MMRI. In addition to caring for laboratory animals, Plaintiff was responsible for MMRI's regulatory compliance, as well

as maintaining records and submitting necessary reports to various state and federal agencies that oversee the wellbeing of laboratory animals.

Given that MMRI primarily used large animals such as dogs prior to the 2017 renovation, Defendants contend that Plaintiff spent most of her Animal Care career tending to large animals. Plaintiff asserts that during her 29 years of employment with MMRI, she was responsible for all aspects of veterinary/husbandry care of both large and small animal colonies, including mice, rats, pigeons, hamsters, rabbits, dogs, and pigs.

Defendants contend that because there were no animals at MMRI during the renovation, and as MMRI was transitioning its focus from large to small animal research, Plaintiff's position was effectively eliminated when construction of the small animal vivarium began.  Defendants further contend that in or around July 2017, instead of immediately terminating Plaintiff, MMRI temporarily assigned Plaintiff to a Research Assistant position.  It was originally anticipated that Plaintiff would continue caring for large animals once the large animal facility was constructed.

In her capacity as a Research Assistant, Plaintiff remained responsible for ensuring MMRI's compliance with regulatory requirements and supporting grant applications relating to the use of animals in institutional research. Plaintiff also took on traditional Research Assistant duties and was assigned to work alongside other Research Assistants in a laboratory setting. Plaintiff did not retain her animal caretaking duties as there were no animals on premises.

### C. The August 2017 Meetings

During her transition from the Animal Care Administrator position to a Research

Assistant position, Mr. Zielinski temporarily supervised Plaintiff. On August 1, 2017, Mr. Zielinski and Amy Pietrafesa ("Ms. Pietrafesa"), MMRI's Director of Human Resources, met with Plaintiff to discuss the Research Assistant position. During this meeting, Plaintiff was told that she was expected to report to work from 9:00 a.m. to 5:00 p.m. so that her schedule mirrored that of the other Research Assistants, which was different from the hours Plaintiff typically worked in her role as Animal Care Administrator. Plaintiff was also asked to keep a daily log of her activities as she transitioned to a new role.  There is a dispute as to what else was discussed at this meeting, but it appears that at some time either at or close to this meeting, Plaintiff was advised that her twenty-four hour building access would be limited to correspond with her new hours.

Plaintiff contends that she had a second meeting with Mr. Zielinski on August 16, 2017.  Plaintiff asserts that at this meeting she asked Mr. Zielinski why she had been "locked out" of the building and why her hours had changed.  Plaintiff contends that Mr. Zielinski became "irate," yelled at her that he did not want Plaintiff at MMRI, claimed that Plaintiff had "stonewalled" one of Mr. Zielinski's investigations, "pushed back on the daily log," and said that Plaintiff had an "attitude." Puleo Aff. ¶¶ 26-27.

Plaintiff also asserts that in August  and September 2017, Mr. Zielinski, "without reason or cause, would spend an inordinate amount of time in [Plaintiff's] workspace lording over [her] but would not say anything;" would "continuously belittle and second-guess [Plaintiff] via email;" and other employees reported to Plaintiff that Mr. Zielinski made statements that reflected negatively on Plaintiff's character. Puleo Aff. ¶¶ 32-34.

### D. Plaintiff's September 26, 2017 Bullying Complaint

As a research institute, MMRI relies heavily on funding from grants through the

National Institutes of Health ("NIH"), as well as other sources. On September 25, 2017, just one week before an NIH grant submission deadline, Plaintiff sent an email to some individuals at MMRI stating that she would be on vacation September 28 and 29, 2017. Mr. Zielinski learned of Plaintiff's anticipated use of vacation time and became concerned that it would impede institutional efforts to meet the impending NIH deadline. To Mr. Zielinski's knowledge, there were a number of outstanding issues related to MMRI's large animal protocols that needed to be resolved prior to submission of the NIH grant application.  Because the preparation of those animal protocols were Plaintiff's responsibility, Defendants assert that Mr. Zielinski had concerns that Plaintiff's use of vacation would hinder the grant application process. Therefore, on September 26, 2017, Mr. Zielinski emailed Plaintiff to address his concerns and to explain that before she took any additional vacation, she needed to be sure that "all large animal protocols/plans/write-ups/etc. [were] in place to support the NIH and any other grants" that were being applied for at the time.  ECF No. 44-5 at 86.

Plaintiff asserts that at the time, Drs. J. Cordeiro and Gary Aistrup had both approved her vacation, and she had already made the submissions relative to the NIH grant. Plaintiff points to evidence indicating that in a September 26, 2017 email from Dr. Cordeiro to Mr. Zielinski, Cordeiro explained that Zielinski was wrong and had overstepped his bounds because Plaintiff had gotten the vacation time approved and the NIH submissions were complete. Puleo Aff. ¶ 30.

On the evening of September 26, 2017, Plaintiff called David Schneeweiss ("Mr. Schneeweiss"), who was the President of MMRI's Board of Directors at the time, to complain about what she perceived to be "bullying" by Mr. Zielinski.  Plaintiff told Mr.

Schneeweiss that she felt bullied by Mr. Zielinski and asked that there be no retaliation for her complaint. *See* ECF No. 44-5 at 83-84 (Zielinski 9/27/17 6:59 am email to Pietrafesa)("David called me at home about 8:15 last night to report that he had received a call from Colleen that I was bullying her, that you and I had belittled her and I had not responded to a request she had in July for a signature on a form necessary to continue animal care certification.").  It is undisputed that at no point during her conversation with Mr. Schneeweiss did Plaintiff state that she was bullied because of her sex or age, nor did she complain of "harassment."

Immediately after speaking with Plaintiff, Mr. Schneeweiss called Mr. Zielinski at home and asked him what had occurred from his point of view.  Mr. Zielinski denied Plaintiff's bullying allegations.  Plaintiff presents evidence indicating that on September 26, 2017 at 5:12 pm, Mr. Zielinski sent Mr. Schneeweiss an email indicating: "FYI… I did not lay Colleen off[2] so she could support the scientists and there would be no excuse for failure to properly submit and hopefully win grants. We'll see what develops ….".  ECF No. 44-5 at 84.  It is unclear whether this email was in response to Mr. Schneeweiss' call to Mr. Zielinski reporting Plaintiff's complaint. *See* ECF No. 44-5 at 83-84.  Mr. Schneeweiss responded: "It's amazing the hutzpah of everyone. Their [sic] making their own beds."  ECF No. 44-5 at 84.

The following morning, September 27, 2017, Mr. Zielinski emailed Ms. Pietrafesa to make her aware of Plaintiff's bullying complaint.  Mr. Zielinski's September 27, 2017 email to Ms. Pietrafesa states, *inter alia*: "I am guessing that [Plaintiff] was [sic] passed

---

[2]Mr. Zielinski indicated at his deposition that he was the one who advocated that Plaintiff be kept on as a Research Assistant during the period when there were no animals at MMRI because of the possibility that MMRI might use large animals in its research in the future. *See* ECF No. 44-1, at 38-39.

the email response to Jon Cordeiro & company and wanted to take pre-emptive action to forestall a possible layoff." *Id.*

Shortly thereafter, Mr. Schneeweiss, Mr. Zielinski, and Ms. Pietrafesa conferred regarding Plaintiff's complaint. Ms. Pietrafesa indicated that she would investigate the complaint and take the appropriate next steps.  Defendants contend that Ms. Pietrafesa's investigation indicated that Mr. Zielinski was merely attempting to manage Plaintiff during her transition from Animal Care Administrator to a Research Assistant position.  Nevertheless, at the conclusion of the investigation, Plaintiff's reporting structure was changed so that she reported to Dr. Cordeiro. Accordingly, effective September 27, 2017, Dr. Cordeiro became Plaintiff's direct supervisor making him responsible for Plaintiff's timesheets, requests for vacation, performance appraisals, and laboratory access. Because Dr. Cordeiro was to be Plaintiff's sole supervisor, Plaintiff was no longer required to provide weekly activity logs to Mr. Zielinski. Shortly thereafter, Plaintiff's twenty-four hour building access was also restored at Dr. Cordeiro's request. The investigatory findings and the remedial actions taken as a result of Plaintiff's complaint were reported to Plaintiff in an email from Ms. Pietrafesa dated October 2, 2017.

### E.  Plaintiff's Termination

As described above, throughout 2017 and 2018, MMRI was in a state of reorganization, reconstruction, and transition. Defendants contend that as preparations to open the small animal vivarium began, it was determined that MMRI no longer had a position for Plaintiff.  Defendants assert that the reason for Plaintiff's termination was two-fold.  First, although Plaintiff had been transitioned to a Research Assistant role

9

with the intention of keeping her on staff until large animals were back on site at MMRI, it had become apparent that large animals would not be reintroduced for several years. Defendants assert that because there were no large animals to care for and because Plaintiff had no experience with transgenic, genetically modified mice, there was no animal care position that Plaintiff was qualified for.

Second, Defendants contend, MMRI was unable to keep Plaintiff on staff in a Research Assistant position due to a lack of grant funding in the laboratory where Plaintiff worked. In this regard, Plaintiff was one of three Research Assistants working in Dr. Cordeiro's lab.  However, Defendants assert, at the time Dr. Cordeiro lacked funding to pay his own salary let alone that of three Research Assistants because he had failed to secure grants to fund his research.  *See* Kontaridis Dec., at ¶ 55.  Defendants explain that MMRI, like many research institutions, operates like a shopping mall. *Id.* at ¶ 56. For example, individual store owners are expected to pay their own rent, payroll, and other expenses; those responsibilities do not fall to the mall owner. *Id.* In similar fashion, the scientists at MMRI are expected to fund their own research and labs, including laboratory staff, through grant funding. *Id.* Defendants assert that when Dr. Kontaridis joined MMRI in January 2018, Dr. Cordeiro had no grant funding and was unable to financially support his lab or pay his research staff. *Id.*  Instead, MMRI was footing the bill for his research, his staff, and his own salary. *Id.* Defendants maintain that given Dr. Cordeiro's lack of grant funding, Dr. Kontaridis had to examine how Dr. Cordeiro's research staff fit the larger needs of MMRI. *Id.* at ¶ 57.  Because he had three Research Assistants and no funding to support their salaries, Dr. Kontaridis made the decision

that the Institute could not bear the financial burden of Dr. Cordeiro's entire staff. *Id.*

Given Plaintiff's lack of research experience compared to the other two

members of Dr. Cordeiro's lab staff, Dr. Kontaridis made the decision to terminate

Plaintiff's employment. *Id.*  Plaintiff's employment was terminated on March 1, 2018.

 Plaintiff contends, however, that there was work and funding for her at MMRI

both in animal care and research.  She maintains she was qualified to fulfill the Animal

Care Assistant position that was awarded on April 2, 2018 to Lewis Guinther ("Mr.

Guinther"), a male considerably younger than Plaintiff.  Plaintiff contends that Mr.

Guinther "took" her job at MMRI "as the Animal Care Attendant." Puleo Aff., ¶ 18.

Plaintiff points out that at the time of her discharge, MMRI had already posted an

advertisement looking to fill the position eventually awarded to Mr. Guinther - thereby

indicating there was funding for this position which, as discussed below, Plaintiff

contends she was eligible to fulfill.

Further, Plaintiff contests whether there was grant funding for her position as a

Research Assistant.  Plaintiff points out that on February 15, 2018, she received a

Memo stating that upon the recommendation of Dr. Kontaridis, the Executive/Personnel

Committee of the Masonic Medical Research Laboratory Board of Directors had

recommended to the full Board of Directors, and the full Board of Directors had

approved, her salary for the 2018 budget.  Puleo Aff., ¶  23.  Plaintiff asserts that she,

Jackie Treat, and Robert Goodrow were assistants in Dr. Cordeiro's lab, but that

Goodrow was working part time in Dr. Cordeiro's lab and "was listed on other scientists'

grants." *Id.* ¶ 42.  She asserts that she "was more qualified than Robert Goodrow in

regards to making/procuring the stem cell lines. This was very important and absolutely

necessary to Dr. Cordeiro's research. Nevertheless, in discriminatory fashion[,] of the three research assistants in Dr. Cordeiro's lab Defendants decided to keep the male employee but terminate me[,] the more experienced female employee[,] and they never consulted with Dr. Cordeiro about this decision." *Id.* ¶ 44.  Plaintiff also asserts that during her employment at MMRI, "scientists were always given time, usually in terms of years, when they where between grants. During this grace period the lab would pay for the scientists and their staffs. To the best of my knowledge no one was fired when grant funding ended." *Id.* ¶ 43.

There is a dispute as to who was responsible for Plaintiff's termination. Defendants present evidence that Dr. Kontaridis was the sole decision maker with respect to Plaintiff's termination.  *See* Declaration of Maria I. Kontaridis, Ph.D., sworn to on November 2, 2022 ("Kontaridis Dec."), at ¶ 51 (Dkt. No. 41-1); Declaration of John S. Zielinski, sworn to on November 3, 2022 ("Zielinski Dec."), at ¶ 38; Deposition of John S. Zielinski, ("Zielinski Depo."), at p. 33-37 (Dkt. No. 44-1); Deposition of David Schneeweiss, at pp. 38-39 (Dkt. No. 44-10); *see also* Deposition of Colleen Puleo ("Puleo Depo."), at p. 42 (Dkt. No. 41-8, Ex. A)("Q: Do you know whether anyone else [other than Dr. Kontaridis] was involved in the decision to end your employment? A: No, I don't know."). They also argue that the facts do not support Plaintiff's contention that Mr. Zielinski was involved in Plaintiff's termination.[3]

---

[3] For example, Defendants point out that Plaintiff cites pages 34 and 35 of Amy Pietrafesa's ("Ms. Pietrafesa") deposition transcript for this proposition, but Defendants contend that neither of these citations suggest Mr. Zielinski made, or influenced, the decision to terminate Plaintiff's employment. In fact, Defendants point out, Ms. Pietrafesa testified with respect to Plaintiff's termination: "[A]s far as I recall, John Zielinski didn't weigh in on this." Deposition of Amy Pietrafesa, ("Pietrafesa Depo."), at p. 33 (Dkt. No. 44-8).

Plaintiff also cites to pages 12–14, 18, 28, 39–41, 47, and 82 of Mr. Zielinski's deposition testimony in an effort to raise an inference that he played some role in the decision to terminate her employment.  As Defendants argue, however, the cited testimony indicates that Mr. Zielinski was MMRI's

Plaintiff implicates Mr. Zielinski in the decision to terminate her employment by pointing to evidence indicating that Mr. Zielinski had the authority to recommend to the Board of Directors that an individual be discharged. She further points to evidence indicating that on at least two occasions Mr. Zielinski was responsible for female employees being discharged. Plaintiff also claims she can establish that her termination occurred under circumstances giving rise to an inference of discrimination because Mr. Zielinski "exhibited a pattern and practice of discrimination against [five] older females," and because he "single[d] out and terminated" her. *Id.* at p. 8.

Defendants argue that Plaintiff's positions should be rejected because Dr. Kontaridis was the sole decision maker with respect to Plaintiff's termination; the evidence indicates that Mr. Zielinski had no influence on the decision to terminate Plaintiff's employment; Plaintiff fails to establish that the "five older women" upon which she bases her pattern and practice claim were similarly situated to her; the actions that Mr. Zielinski took relative to Plaintiff were implemented for legitimate reasons to support Plaintiff in her transition to a new role at MMRI and Plaintiff fails to present anything to connect this conduct to her age or gender; that Plaintiff fails to present evidence causally connecting Mr. Zielinski's allegedly discriminatory conduct with the legitimate, non-discriminatory, non-retaliatory decision Dr. Kontaridis made to terminate Plaintiff's

---

Chief Financial Officer; that he was familiar with the employee handbook; that he initially held a position equal to Dr. Kontaridis in terms of MMRI's organizational structure; that he influenced the decision to temporarily assign Plaintiff to a Research Assistant position; that he had general hiring and firing authority, subject to Board approval; and that MMRI intended to build a large animal facility. *Id.* None of this testimony directly supports Plaintiff's contention that Mr. Zielinski was involved in her termination. *See id.* Defendants also point out that Plaintiff fails to cite the portions of Mr. Zielinski's deposition during which he was asked about his involvement in Plaintiff's termination. *See* Zielinski Depo., at pp. 33-37. There, Mr. Zielinski testified that he was not consulted about whether Plaintiff should be terminated, that he offered no opinion on the matter, and that he was merely informed about the decision Dr. Kontaridis had already made to terminate Plaintiff's employment. *Id.; see also* Zielinski Dec., at ¶ 38.

employment; and Plaintiff fails to demonstrate that she was "replaced" with Lewis Guinther.

### F.  Relevant  Post-Renovation Animal Care at MMRI

As described above, throughout 2017 and 2018, MMRI was in a state of reorganization, reconstruction, and transition. In anticipation of the full-time on-boarding of Dr. Kontaridis in January 2018, MMRI transitioned from a large- to predominately small-animal model of research. Therefore, Defendants contend, MMRI's recruitment efforts in 2018 and the latter half of 2017 were focused on hiring individuals knowledgeable about small animal research, with a particular emphasis on the mouse model system of research and genetically modified mice. In light of this transition, Defendants contend, MMRI required its Animal Care staff to have the proper background and experience to breed, house, and care for a large mouse population.

Accordingly, on September 15, 2017 and October 18, 2017, MMRI posted an opening for a Manager of Animal Research Facilities.  Among other things, this person would be responsible for coordinating animal care, developing and implementing standard operating procedures related to animal care, and providing training in animal care.  On November 6, 2017, Plaintiff emailed Dr. Kontaridis stating: "I was rather shocked and surprised to see that the MMRL[4] is advertising for my current position. Could you elaborate on this .... do I need to reapply for my current position as Animal Care Administrator?" ECF No. 41-2 at 6.  Dr. Kontaridis responded:

> Dear Colleen,
>
> Thank you for your email. I am happy to discuss the position of Manager/Director of the Animal Research Facilities. The Director for Animal Research position will be a new and different role from your current position

---

[4] The Court presumes that this acronym stands for Masonic Medical Research Laboratory.

14

as large animal care administrator, which principally coordinates the day-to-day care of the large animals and which is a role I expect to continue at the MMRL. The new position will require management experience, someone who can coordinate the workload for an administrative care staff; someone who preferably has experience with a full-barrier mouse facility, in addition to understanding the underpinnings of running a large animal facility/surgeries; someone who has full understanding and who can apply for get [sic] the needed federal licensing for animal care and procedures; and someone who can coordinate approval of IACUC research protocols for the researchers. In this regard, if you feel you meet the qualification of this position, I strongly encourage you to please apply; your application will be given the utmost consideration. Please know that I think you are and will continue to be a valuable asset to the laboratory, in any capacity, and my hope is that you will continue working at the MMRL for many years to come. Hope this helps relieve some of your concerns. I am happy to chat by phone should you have additional questions or concerns regarding this or your current position in the lab.

With best wishes,

Maria

*Id.*

At her deposition, Plaintiff agreed that Dr. Kontaridis personally invited her to apply for the position, but, despite knowledge of the newly posted position and a personal invitation to apply, Plaintiff never applied for it. Puleo Depo., at p. 54; *see* Kontaridis Dec., at ¶ 28. Moreover, Plaintiff concedes that she was not qualified for the position. *See* Complaint, at ¶ 65 ("Plaintiff was not qualified to hold Mrs. Guinther's job.").

On January 29, 2018, MMRI hired Sarah Guinther ("Ms. Guinther") as its Manager of Animal Research Facilities. Kontaridis Dec., at ¶¶ 29-30.  Ms. Guinther came to MMRI with approximately fourteen years of experience in the animal sciences field. Deposition of Sarah Guinther ("S. Guinther Depo."), at pp. 41-46. In those fourteen years, Ms. Guinther had primarily worked with mice and rats, including genetically

modified mice. *Id.* at p. 44-45.  Moreover, Ms. Guinther was familiar with full-barrier vivaria, and in fact, helped design and open multiple animal research facilities prior to joining MMRI. *Id.*

In her role as the Manager of Animal Research Facilities, Ms. Guinther was responsible for managing animal care at MMRI. Kontaridis Dec., at ¶ 31. During 2018 and into 2019, this primarily involved managing the small animal vivarium as the large animal space had not yet been constructed. *Id.*  Ms. Guinther also assisted with the design plans for the small and large animal spaces, and prepared for the arrival of genetically modified mouse models, including Dr. Kontaridis' mouse colony. *Id.* Ms. Guinther additionally assisted in MMRI's animal care compliance efforts by ensuring that the Institution submitted all of the documentation required to maintain its licensure as an animal research facility. *Id.* at ¶ 33.

Having identified the need for a support position within the Animal Care Department, on January 13, 2018, MMRI posted a position for an Animal Care Assistant. *Id.* at ¶ 34.  Defendants contend that, like the Manager of Animal Research Facilities, this was a newly created position which required the ability to conduct husbandry, genotyping, and care of genetically modified mouse models. *Id.* at ¶ 35, Ex. C.  Defendants further contend that while the position generally required the care of laboratory animals, the laboratory animal population at MMRI was transitioning to genetically modified mice, where each unique line would have to be specifically bred and genotyped. *Id.* at ¶ 35. Thus, Defendants maintain, the posted position called for a small Animal Care Assistant. *Id.*  Plaintiff never applied for the position even though,

Defendants contend, Dr. Kontaridis verbally informed her that MMRI was hiring for that role. *Id.* at ¶ 36.

Plaintiff contends that she was not aware that the position was available until after she was terminated and Mr. Guinther was hired for the Animal Care Assistant position. *See* Puleo Aff., ECF No. 44-5 at ¶¶ 15-16.  Plaintiff also contends that she did not think that she needed to re-apply for any position at MMRI because in email communications with Dr. Kontaridis about the newly created Manager of Animal Research position (which Dr. Kontaridis advised Plaintiff to apply for but she did not), Dr. Kontaridis stated: "Please know that I think you are and will continue to be a valuable asset to the laboratory, in any capacity, and my hope is that you will continue working at the MMRL for many years to come." *Id.* at  ¶ 15.

Although not explicitly stated in Plaintiff's opposition, it appears Plaintiff is claiming that she should have been hired into the Animal Care Assistant position in April 2, 2018.  Pointing to the verbiage of the Animal Care Assistant job posting and noting that it made no express reference to "mice," "genetically altered mice," "small animals," or "breeding," Plaintiff appears to contend that she was qualified for this position because it was essentially the same position as the Animal Care Administrator position Plaintiff held. She further argues that, even assuming the Animal Care Assistant position required experience with genetically altered mice, she had this experience.

Defendants counter that after the small animal vivarium was constructed, MMRI's animal population consisted almost exclusively of transgenic, genetically modified mice and other small animals. *See* Kontaridis Dec., at ¶¶ 24, 63. Therefore, Defendants contend, the post-renovation animal care positions at MMRI naturally related to the care

of small, genetically modified animals making the Animal Care Assistant position distinct from the position Plaintiff held as Animal Care Administrator before July 2017.  Further, Defendants point out that Dr. Kontaridis testified at her deposition that the Animal Care Assistant job posting was imperfect because Human Resources rather than scientific staff created it. Deposition of Maria I. Kontaridis, Ph.D. ("Kontaridis Depo."), at p. 112 (Dkt. No. 44-3). The lack of certain verbiage in the job description, Defendants maintain, is not evidence that experience with transgenic, genetically modified mice was unimportant to the Animal Care Assistant position. *See id.*  Still further, Defendants argue that testimony from Dr. Kontaridis, Ms. Guinther, and Mr. Guinther confirms that this experience was crucial to post-renovation animal care at MMRI. Kontaridis Depo., at pp. 29, 35, 78-79, 92, 112; Deposition of Sarah Guinther, at pp. 13, 20-21, 30 (Dkt. No. 41-9, Ex. B); Deposition of Lewis Guinther ("L. Guinther Depo."), at pp. 10-11 (Dkt. No. 41-9, Ex. C).  Finally, Defendants argue that, to Dr. Kontaridis's knowledge, Plaintiff lacked experience with genetically modified mice and thus Plaintiff was not qualified for any of the post-renovation animal care positions at MMRI even if she had applied for them. Kontaridis Dec., at ¶ 53; Puleo Depo., at p. 57 ("Q: Did you have experience working with transgenic mice at MMRI? A: No.").

On April 2, 2018, Mr. Guinther[5] was hired for the Animal Care Assistant position. Kontaridis Dec., at ¶ 37; Deposition of Lewis Guinther ("L. Guinther Depo."), at p. 17. Like Ms. Guinther, Mr. Guinther came to MMRI with significant experience working with

---

[5] Defendants point out that Sarah Guinther and Lewis Guinther are husband and wife. S. Guinther Depo., at p. 33;  L. Guinther Depo., at p. 12.  They contend that at no point during their respective careers at MMRI did either report to the other. S. Guinther Depo., at p. 34-35; L. Guinther Depo., at p. 16. Instead, both Ms. Guinther and Mr. Guinther independently reported to Dr. Kontaridis. Kontaridis Dec., at ¶ 41.

transgenic mice. L. Guinther Depo., at pp. 22, 27-28.  Defendants point out that by the time he was hired in 2018, Mr. Guinther had ten years of experience working with genetically modified mice similar to those that would comprise the core of MMRI's research in 2018 and beyond. *Id*. at pp. 27-28.

Before he was hired, Mr. Guinther was interviewed not only by Dr. Kontaridis, but also by Robert Quinn, DVM ("Dr. Quinn"), MMRI's consulting Veterinarian. *Id*. at p. 29; Kontaridis Dec., at ¶ 38. Dr. Quinn emphatically endorsed Mr. Guinther for the Animal Care Assistant position. Kontaridis Dec., Ex. D (Email from Dr. Quinn) ("Just interviewed Lewis. He has more experience than we could ask for, seems very personable and both he and Sarah seem to have thought through all the considerations one would worry about with a married couple working together. I think we would be lucky to get him in this position.").

In the Animal Care Assistant position, Mr. Guinther was responsible for cleaning, feeding, and caring for the mice housed at MMRI. L. Guinther Depo., at pp. 10-11; Kontaridis Dec., at ¶ 40.  Mr. Guinther also had breeding duties which involved maintaining the different genetic lines of Dr. Kontaridis' mice and ensuring they continued to breed.  L. Guinther Depo., at pp. 11-12, 15; Kontaridis Dec., at ¶ 40. Defendants contend that as Dr. Kontaridis' mice were the first animals reintroduced at MMRI after the third floor renovation was complete, and given their scientific importance and  monetary value, it was of crucial importance to ensure proper care by handlers with sufficient experience and knowledge of small genetically modified animals. Kontaridis Dec., at ¶ 42.

Plaintiff contends that Lewis Guinther "took my job at MMRI as the Animal Care Attendant, as it was the same job I had performed for MMRI for approximately 29 years." Puleo Aff. ¶ 18.  She contends that "[o]n numerous occasions Mrs. Guinther had stated to me that Lewis Guinther had been assured employment at the MMRI. She stated Lewis Guinther's expertise were [sic] knowledge of IACUC rules. She never once said that he had experience with transgenic mice." *Id.* ¶ 19.  Plaintiff further contends: "I can and have in the course of my employment successfully anesthetized animals for experiments at MMRI, it is my understanding Lewis Gunther, my replacement[,] cannot as he has tried anesthetize dogs and one pig while at MMRI but has not done so successfully." *Id.* ¶ 20.

### G.  Construction of MMRI's Large Animal Facility

The construction of the large animal facilities at MMRI did not begin until December 2019, and was not complete until December 2020.  It was not until September of 2021 that large animals were actually used for research purposes at MMRI. Even then, the use of large animals was limited.  On one occasion, three pigs were used in connection with a tutorial on how to conduct a pig study. Defendants contend that with the exception of the pigs used in the above-described tutorial, there have been no other large animals housed at MMRI since phase one of the renovation began in June 2017.  Defendants further contend that the animal population at MMRI since August 2018, when the small animal vivarium was complete, has been overwhelmingly transgenic mice. Plaintiff disputes the limited nature of the animal population at MMRI by pointing out that in 2021/2022, Defendants advertised employment positions for large animal husbandry.

## IV.    DISCUSSION

### A.  Retaliation Claims

"The *McDonnell Douglas* burden-shifting analysis applies to retaliation claims under Title VII, the ADEA, and the NYSHRL." *Pang v. Cushman & Wakefield*, No. 20CV10019VECSN, 2022 WL 19410316, at *13 (S.D.N.Y. Aug. 23, 2022), *report and recommendation adopted sub nom. Pang v. Cushman & Wakefield U.S., Inc.*, No. 20CV10019VECSN, 2023 WL 2644267 (S.D.N.Y. Mar. 27, 2023)(citing *Cifra v. G.E. Co.*, 252 F.3d 205, 216 (2d Cir. 2001); *Gorzynski v. Jetblue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010); *Chavis v. Wal-Mart Stores, Inc.*, 265 F. Supp. 3d 391, 398 (S.D.N.Y. 2017)). "To establish a prima facie case of retaliation, 'the plaintiff must show that [s]he engaged in protected participation or opposition under [Title VII, the ADEA, or the NYSHRL], that the employer was aware of this activity, that the employer took adverse action against the plaintiff, and that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action.'" *Id.* (quoting *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 208–09 (2d Cir. 1990)).  "A plaintiff's burden in this regard is '*de minimis*,' and the 'court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive.'" *White v. City of Middletown*, 45 F. Supp. 3d 195, 214 (D. Conn. 2014)(quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)).

On the first element of the prima facie case, Plaintiff must establish that she engaged in protected activity. "Protected activities include those actions taken to protest or oppose statutorily prohibited discrimination." *Colton v. New York Div. of State Police*,

No. 5:14-CV-00801, 2017 WL 5508911, at *11 (N.D.N.Y. Feb. 8, 2017) (internal quotation marks and citation omitted).  In order to be considered protected by the relevant anti-discrimination statues, Plaintiff's actions must have been accompanied by a good faith, reasonable belief that the underlying challenged actions of the employer constituted statutorily prohibited discrimination. *Id.* (internal quotation marks and citation omitted).  While Plaintiff need not show that the challenged action was, in fact, unlawful, a subjective belief of impropriety is necessary. *Id.* (internal quotation marks and citation omitted).  Plaintiff contends that she believed that her September 26, 2017 bullying complaint about Mr. Zelinski constituted protected activity under Title VII, the ADEA, and the NYSHRL. This is sufficient to satisfy the first element of the prima facie case.

On the second element of the prima facie case, Plaintiff must establish that the employer was aware of her protected activity.  Plaintiff fails to satisfy this element.  "To constitute 'protected activity,' a plaintiff's complaint must include 'sufficiently specific terms so that the employer is put on notice that the plaintiff believes he or she is being discriminated against on the basis of race ... or any other characteristic protected by" a relevant statute. *Morales v. Bottling Grp., LLC*, 374 F. Supp. 3d 257, 274 (W.D.N.Y. 2019), *aff'd sub nom. Campbell v. Bottling Grp., LLC*, 814 F. App'x 630 (2d Cir. 2020)(quoting *Lehman v. Bergmann Assocs., Inc.*, 11 F.Supp.3d 408, 417-18 (W.D.N.Y. 2014) (citation omitted)). "'The onus is on the speaker to clarify to the employer that [s]he is complaining of unfair treatment due to [her] membership in a protected class and that [s]he is not complaining merely of unfair treatment generally.'" *Id.* (quoting *Hanfland v. Brennan*, 2015 WL 6134177, *11 (W.D.N.Y. 2015) (citation omitted)); *see McKenzie v. Big Apple Training Inc.*, No. 1:22-CV-9554-GHW, 2023 WL 4866041, at *9

(S.D.N.Y. July 31, 2023)("'Mere complaints of unfair treatment are not protected speech in the employment retaliation context,' and it is the speaker's responsibility 'to clarify to the employer that he is complaining of unfair treatment due to his membership in a protected class and that he is not complaining merely of unfair treatment generally.'")(quoting *Benzinger v. Lukoil Pan Ams.*, LLC, 447 F. Supp. 3d 99, 124 (S.D.N.Y. 2020) (quotation and ellipsis omitted)); *Chauhan v. MM Hotel Mgmt. LLC*, No. 18 CV 5963, 2019 WL 6118006, at *9 (E.D.N.Y. Nov. 18, 2019)("To qualify as protected activity, a plaintiff must clarify to the employer that he is complaining of unfair treatment due to his membership in a protected class and that he is not complaining merely of unfair treatment generally.") (quoting *Sletten v. LiquidHub, Inc.*, No. 13 Civ. 1146, 2014 WL 3388866, at *5 (S.D.N.Y. July 10, 2014)) (internal quotations and citations omitted); *Hanfland v. Brennan*, 2015 WL 6134177, *11 (W.D.N.Y. 2015) (citation omitted) ("The onus is on the speaker to clarify to the employer that he is complaining of unfair treatment due to his membership in a protected class and that he is not complaining merely of unfair treatment generally.").

"[I]mplicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited" by a particular statute. *Jackson v. Syracuse Newspapers,* No. 10-CV-1362 (NAM), 2013 WL 5423711, at *20 (N.D.N.Y. Sept. 26, 2013) (citation omitted). "[G]eneralized complaints of unfair treatment do not qualify as a protected activity." *Eckhart v. Fox News Network, LLC*, No. 20-CV-5593 (RA), 2021 WL 4124616, at *20 (S.D.N.Y. Sept. 9, 2021) (internal quotation marks and citation omitted). Similarly, "'ambiguous complaints that do not make the

employer aware of alleged discriminatory misconduct do not constitute protected activity.'" *McKenzie*, 2023 WL 4866041, at \*9 (quoting *Int'l Healthcare Exch., Inc. v. Glob. Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 357 (S.D.N.Y. 2007) (citations omitted), and citing *Venezia v. Luxoticca Retail N. Am. Inc.*, No. 13-cv-4467 (RJS), 2015 WL 5692146, at \*12 (S.D.N.Y. Sept. 28, 2015)).

Here, it is undisputed that Plaintiff did not state in her complaint about Mr. Zelinski that he bullied her because of her sex or age, or that she was complaining of improper harassment.  Indeed, when Plaintiff was asked at her deposition what she believed motivated Mr. Zielinski to bully her, Plaintiff testified that she "ha[d] no idea." Puleo Depo., at p. 107. When asked a second time what Plaintiff believed was the motivation for Mr. Zielinski's alleged behavior and attitude toward her, she again testified that she "ha[d] no idea." *Id.* at p. 109.

Under the circumstances, even though Plaintiff may have believed she was engaging in protected conduct, her complaint was insufficient to make out a prima facie case of retaliation under Title VII, the ADEA, or the NYSHRL. *See, e.g, Malone v. Town of Clarkstown*, No. 19 CV 5503 (VB), 2022 WL 2834105, at \*8 (S.D.N.Y. July 20, 2022) ("Similarly, plaintiff's complaints about harassing conduct . . . are not protected activity because they complaint of general bullying and harassment that plaintiff does not claim are linked to or motivated by her sex."); *Johnson v. City Univ. of New York*, 48 F. Supp. 3d 572, 577 (S.D.N.Y. 2014)(plaintiff's "complaints about his boss's bullying and harassment" did not constitute protected activity where there was no allegation that the complained of treatment was because of plaintiff's membership in a protected class); *Lynch v. Nat'l Fuel Gas Distribution Corp.*, 25 F. Supp. 3d 358, 367 (W.D.N.Y. 2014)

("plaintiff has produced no evidence of any complaint, formal or informal, sufficient to have placed [employer] on notice that by complaining about [supervisor]'s 'bullying' she was referring to discriminatory activity"). The record lacks sufficient evidence from which a reasonable fact finder could conclude that the employer was, or should have been, aware that Plaintiff's September 26, 2017 bullying complaint was directed at conduct protected or prohibited by Title VII, the ADEA, or the NYSHRL.  "Simply stated, plaintiff fails to meet the minimal requirements for establishing a prima face case of retaliation because she fails to establish that she engaged in protected activity under Title VII[,]" the ADEA, or the NYSHRL. *Colton*, 2017 WL 5508911, at *16.  Accordingly, Defendants' motion directed to Plaintiff's retaliation claims is granted and the retaliation claims are dismissed.

### B. Discrimination Claims

"Title VII, ADEA, and NYSHRL [discrimination] claims are evaluated under the *McDonnell Douglas* framework." *Szewczyk v. Saakian*, No. 21-672, 2022 WL 2037196, at *1 (2d Cir. June 7, 2022)(citing *McDonnell Douglas*, 411 U.S. at 802–04; *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 82–83 (2d Cir. 2015) (Title VII); *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 129 (2d Cir. 2012) (ADEA); *Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010) (NYSHRL)). "'Under *McDonnell Douglas*, a plaintiff bears the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination; it is then the defendant's burden to proffer a legitimate non-discriminatory reason for its actions; the final and ultimate burden is on the plaintiff to establish that the defendant's reason is in fact pretext for unlawful

discrimination.'" *Id.* (quoting *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 251 (2d Cir. 2014)).

Plaintiff's prima facie case is primarily based upon the contention that Mr. Zelinski played some role in her termination, and that he was motivated by age and gender animus. Her arguments largely ignore the facts that MMRI was transitioning to a small animal research model focused on transgenic mice, and that at the time of Plaintiff's discharge Dr. Kontaridis understood Plaintiff to lack the experience necessary to assist research on transgenic mice and therefore there was not a position available for her. Nevertheless, even assuming that Plaintiff establishes a prima facie case of sex and age discrimination, Defendants proffer legitimate, non-discriminatory reasons for their decision to discharge her and not to hire her for the Animal Care Assistant position (for which she never applied). For reasons discussed below, Plaintiff fails to establish that Defendants' reasons for her discharge are in fact pretext for unlawful discrimination.

> Upon demonstration of the plaintiff's prima facie case, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for its decisions. *McDonnell Douglas*, 411 U.S. at 802-05. "[T]he employer's burden of showing a legitimate non-discriminatory reason for its actions is not a particularly steep hurdle. It is not a court's role to second-guess an employer's personnel decisions, even if foolish, so long as they are non-discriminatory." [*Brierly v. Deer Park Union Free Sch. Dist.*, 359 F. Supp. 2d 275, 291 (E.D.N.Y. Mar. 23, 2005)]. "If the employer is able to satisfy that burden, the inquiry then returns to the plaintiff, to demonstrate that the proffered reason is a pretext for discrimination." *Setelius v. Nat'l Grid Elec. Servs. LLC*, No. 11-CV-5528, 2014 WL 4773975, at *6 (E.D.N.Y. Sept. 24, 2014) (quoting United States v. City of New York, 717 F.3d 72, 102 (2d Cir. 2013)). It is not enough for the plaintiff to simply show that defendant's stated reasons were false or not believable, plaintiff must instead show that a discriminatory reason prompted the alleged adverse employment action taken by the defendant. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993). "[I]n order to raise an issue of fact that is sufficiently material to defeat a motion for summary judgment, the plaintiff must produce more than simply some evidence; it must be enough evidence to support a rational finding that the defendant's explanation for the adverse action is actually a

26

pretext to disguise discrimination." *Barounis v. N.Y.C. Police Dep't*, No. 10 Civ. 2631, 2012 WL 6194190, at *6 (S.D.N.Y. Dec. 12, 2012) (citations omitted); *see also Smith v. Am. Exp. Co.*, 853 F.2d 151, 154-55 (2d Cir. 1988) (In order to rebut an employer's proffered non-discriminatory rationale for its actions and withstand summary judgment, a plaintiff must present more than allegations that are "conclusory and unsupported by evidence of any weight.")

*King v. N. Amityville Fire Co., Inc.*, No. 19-CV-04643 (JMA/AYS), 2023 WL 4827103, at

*8 (E.D.N.Y. July 27, 2023).

Defendants assert that Plaintiff's was terminated as a result of (i) MMRI's

restructuring and transition from large to small animal research; and (ii) the lack of grant

funding to pay her Research Assistant salary.  Def. MOL at 29-30.  Defendants also

contend that Plaintiff never applied for the Animal Care Assistant position, and even if

she had, she was not qualified for the position.  Def. Reply at 6. This satisfies

Defendant's burden at this stage, thereby shifting the burden back "to the plaintiff to

demonstrate by competent evidence that 'the legitimate reasons offered by the

defendant were not its true reasons, but were a pretext for discrimination.'" *Patterson v.*

*County of Oneida,* 375 F.3d 206, 221 (2d Cir.2004) (quoting *Texas Dep't of Cmty.*

*Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

Courts in this Circuit have explained that "a reason [for termination] cannot be

proved to be a pretext for discrimination unless it is shown both that the reason was

false, and that discrimination was the real reason." *Isaac v. City of New York*, 701 F.

Supp. 2d 477, 488 (S.D.N.Y. 2010) (quotations and citations omitted). "The burden of

establishing pretext is a higher burden than that required to establish the prima facie

case, and the Second Circuit has instructed that [a] plaintiff[']s 'initially vague allegation

of discrimination' must be 'increasingly sharpened and focused' at this stage." *Id*. at 488

(quoting *Meiri v. Dacon,* 759 F.2d 989, 995 (2d Cir.1985) (affirming summary judgment in favor of defendant)).  Although the "trier of fact may still consider the evidence establishing plaintiff's prima facie case 'and inferences properly drawn therefrom ... on the issue of whether the defendant's explanation is pretextual," *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142–43, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting *Burdine*, 450 U.S. at 255 n. 10), "[t]o get to the jury, '[i]t is not enough ... to disbelieve the employer; the fact finder must [also] believe the plaintiff's explanation of intentional discrimination.'" *Weinstock v. Columbia Univ.,* 224 F.3d 33, 42 (2d Cir. 2000)(quoting *St. Mary's*, 509 U.S. at 519). "The plaintiff's opportunity to demonstrate that the employer's proffered reason was false now merges with her ultimate burden to persuade the trier of fact that she has been the victim of intentional discrimination (i.e., that an illegal discriminatory reason played a motivating role in the adverse employment decision)." *Bickerstaff v. Vassar College*, 196 F.3d 435, 446–47 (2d Cir.1999) (citations omitted); *see also Reeves*, 530 U.S. at 142–43 (Plaintiff bears the burden of demonstrating that the defendant's reasons are a pretext for a racial motivation for its actions).

In her opposition, Plaintiff claims that Defendants offer shifting explanations and have created a "new reason" for the decision to terminate her employment. Plaintiff claims that at the time of her termination Defendants asserted that "Plaintiff was not qualified to work with genetically altered mice, but Lewis Guinther was. Specifically, only one reason was given at the time of Plaintiff's termination which was that due to lab restructuring with the genetically modified mice, Plaintiff was being terminated." Plaintiff's MOL, at p. 19. Plaintiff contends that this reason was pretextual "because she

was more than qualified to work with such mice." *Id.*  Plaintiff also argues that at the time of her termination "there was plenty of employment for [her]" because evidence existed that MMRI "was planning the buildout for both small *and large* animals in 2017 into 2018." *Id.* at 20 (emphasis in original).  In addition, Plaintiff asserts that "Defendants have invented a new reason for Plaintiff's termination, claiming there was no money in the budget for her position."  *Id.*, at 23.  Plaintiff contends that the Court should reject this basis for her termination because it was not identified in interrogatory responses, and because she "was qualified for Lewis Guinther's job [for] which there was funding for as earlier as January or February of 2018." *Id.* Plaintiff also contends that the evidence indicates that there was funding for Plaintiff's temporary research position with Dr. Cordero. *Id.* at 24.

In their Reply, Defendants point out that Plaintiff testified that she was not provided any reason for her termination except that there was no longer a position for her, and therefore the Court should reject her argument based of alleged shifting explanations for her termination.  *See* Reply, at 15 (citing Puleo Depo., at pp. 38, 41-42). Defendants also contend that from the time of Plaintiff's termination until present day, they have never wavered on the fact that Plaintiff was terminated in large part due to MMRI's restructure and transition to small animal research. *Id.*  As to Plaintiff's contention that Defendants secondarily explain that they were unable to retain Plaintiff in her temporary Research Assistant position due to a lack of grant funding, Defendants argue that the fact that more than one reason motivated the decision to end Plaintiff's deployment does nothing to advance Plaintiff's claim of pretext. *See id.* Defendants contend that neither reason is mutually exclusive of the other, and that neither indicates

that "Plaintiff's age, gender, or participation in protected activity was the true motivation for her termination." *Id.* For the reasons discussed below, the Court agrees with Defendants.

Plaintiff conflates the reason she was not selected for the Animal Care Assistant position (a job for which she did not apply), and the reason MMRI did not retain her in the temporary Research Assistant position. Putting aside the fact that she did not apply for the Animal Care Assistant position, Defendants contend that Plaintiff was not hired for this position due to her inexperience with transgenic mice. *See* Kontaridis Dec., at ¶ 53. Defendants contend that a lack of funding played no role in this aspect of the decision to terminate Plaintiff's employment. *See id.* Instead, Defendants contend, a lack of grant funding in the laboratory where Plaintiff was working as a Research Assistant motivated Dr. Kontaridis's decision that MMRI could not retain her in a research position. *Id.* at ¶¶ 55-57. Thus, Defendants contend, while Plaintiff claims that there was funding for her to remain on staff given the hiring of Mr. Guinther, she fails to appreciate that Defendants' funding rationale related only to its inability to retain her in the Research Assistant position.

Plaintiff claims that the decision to terminate her employment was pretextual because she was qualified for the Animal Care Assistant position. The claim fails for several reasons. First, it is undisputed that Plaintiff never applied for this position. Kontaridis Dec., at ¶ 36; Puleo Depo., at p. 47.

Second, even if it is reasonable to assume that Dr. Kontaridis should have considered Plaintiff for this position without an application because Dr. Kontaridis said to Plaintiff that her "hope is that you will continue working at the MMRL for many years to

come" when the two communicated about the Manager of Animal Research Facilities position (a position for which Plaintiff did not apply), the evidence indicates that the Animal Care Assistant position required applicants to have experience caring for and breeding genetically modified, transgenic mice. While the posting for this position may not have specifically included this requirement, it is clear that Dr. Kontaridis deemed this position to have this requirement. This is evidenced by the fact that after the small animal vivarium was constructed, MMRI's animal population consisted almost exclusively of transgenic, genetically modified mice and other small animals. *See* Kontaridis Dec., at ¶¶ 24, 63.  Therefore, Defendants were entitled to conclude that the post-renovation animal care positions at MMRI related to the care of small, genetically modified animals, as was confirmed by the testimonies from Dr. Kontaridis, Ms. Guinther, and Mr. Guinther at their depositions.  The lack of certain verbiage in the job description is not compelling evidence that experience with transgenic, genetically modified mice was unimportant to the Animal Care Assistant position.  Indeed, "[i]t is not a court's role to second-guess an employer's personnel decisions, even if foolish, so long as they are non-discriminatory." *Brierly*, 359 F. Supp. 2d at 291.  It is well-settled law that in employment discrimination cases, "the court must respect the employer's unfettered discretion to choose among qualified candidates.... Our role is to prevent unlawful hiring practices, not to act as a 'super personnel department' that second guesses employers' business judgments." *Byrnie v. Town of Cromwell, Bd. of Educ.,* 243 F.3d 93, 103 (2d Cir. 2001), *superseded in other part by* Fed. R. Civ. P. 37(e) (2015).  Still further, testimony from Dr. Kontaridis, Ms. Guinther, and Mr. Guinther confirms that this experience was crucial to post-renovation animal care at MMRI.

At her deposition, Plaintiff testified that she did not have experience working with transgenic mice at MMRI. *See* Puleo Depo., at p. 57 ("Q: Did you have experience working with transgenic mice at MMRI? A: No."). In her opposition, Plaintiff appears to contradict this testimony and claim that she did have experience "work[ing] with genetically modified mice" while employed by MMRI. Puleo Aff., at ¶ 9. In her sur-reply, Plaintiff contends that the referenced portion of her deposition she was referring to whether she had worked with Dr. Kontaridis's mice, but she points out that in another portion of her deposition she indicated that she had worked on two studies at MMRI involving genetically altered mice. *See* ECF No. 53 (citing Pl. Depo.at 23-25).

However, Plaintiff's deposition testimony indicates that the genetically altered mice that she worked with were in a colony that existed from 1989 to 2014 or 2015. *See* Pl. Depo. at 23-24. Dr. Kontaridis officially started as the Director of Research on January 1, 2018, and prior to her official start date she worked for MMRI as a part-time consultant from October 2017 until January 1, 2018. Even assuming Plaintiff did have this experience, no evidence indicates that Dr. Kontaridis had knowledge about Plaintiff's work with genetically modified mice. *See* Kontaridis Dec., at ¶ 53. Indeed, when Dr. Kontaridis responded to Plaintiff's email about the Manager of Animal Research Facilities position, Dr. Kontaridis stated that this position was "a different role from [Plaintiff's] current position as large animal care administrator, which principally coordinates the day-to-day care of the large animals." This indicates that Dr. Kontaridis was unaware of Plaintiff's former work with genetically modified mice. Further, Plaintiff does not allege that Dr. Kontaridis knew or should have known about Plaintiff's claimed experience with genetically modified mice, nor does she provide any evidence that

suggests Dr. Kontaridis had that information. *See* Puleo Aff. at ¶¶ 4-5, 9. Under the circumstances, and without an application by Plaintiff for the Animal Care Assistant position, she fails to present a meritorious claim that she was passed over for this position in favor of a younger male.

Third, to the extent that Plaintiff contends that Defendants' reason for not hiring her into the Animal Care Assistant position is pretextual because she had experience comparable to Mr. Guinther, and that both she and Mr. Guinther would have had to be trained for the position anyway, the contention is insufficient.  Even if Plaintiff did have some experience with transgenic mice, Plaintiff cannot demonstrate pretext based on her subjective belief that she was more qualified for the Animal Care Assistant position than Mr. Guinther. *See Tapia v. TWC Admin. LLC*, No. 17-CV-431 (KMK), 2018 WL 5016608, at *12 (S.D.N.Y. Oct. 16, 2018) ("Plaintiff's subjective belief that she was more qualified for the position, without any evidence showing she was clearly more qualified, is insufficient to show that race or national origin played a motivating role in the decision not to promote Plaintiff.") (collecting cases); *Tsaganea v. City Univ. of New York*, No. 06 CV 15366(DAB), 2010 WL 1142017, at *2 (S.D.N.Y. Mar. 23, 2010), *aff'd sub nom. Tsaganea v. City Univ. of New York, Baruch Coll.*, 441 F. App'x 12 (2d Cir. 2011) ("[i]f an employer decides to weigh some qualifications more heavily when selecting candidates, it is inappropriate for a court to question this value judgment absent some plausible showing that the employer's stated reasons are a pretext for discrimination").

Here, the record is replete with evidence regarding Mr. Guinther's experience working with genetically modified mice. This indicates that by the time Mr. Guinther joined MMRI, he had ten years of experience working with transgenic, genetically

modified mice similar to those that would comprise the majority of MMRI's post-renovation animal population. L. Guinther Depo., at pp. 27-28.  Mr. Guinther was also vetted by MMRI's independent, consulting Veterinarian, who opined that Mr. Guinther "ha[d] more experience than we could ask for." *Id.* at p. 29; *see also* Kontaridis Dec., at ¶ 38, Ex. D.  Given his vast experience with genetically modified mice, Mr. Guinther was selected for the Animal Care Assistant position. In light of this evidence, Plaintiff's claim that "there is a factual dispute over the qualifications of [Mr.] Guinther" is without merit. Plaintiff's MOL, at p. 22. This is particularly true given Plaintiff's admissions that she is unfamiliar with Mr. Guinther's educational and vocational background, or the extent of his work with mice, rats, and other small animals. Puleo Depo., at p. 48.  Further,

> [i]t is true that "an employer's disregard or misjudgment of a plaintiff's job qualifications may undermine the credibility of an employer's stated justification for an employment decision." *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001), *superseded in other part by* Fed. R. Civ. P. 37(e) (2015). "At the same time," courts "must respect" employers' "unfettered discretion to choose among qualified candidates." *Id.* (internal quotation marks omitted). Thus, "[w]hen a plaintiff seeks to prevent summary judgment on the strength of a discrepancy in qualifications ignored by an employer, that discrepancy must bear the entire burden of allowing a reasonable trier of fact to not only conclude the employer's explanation was pretextual, but that the pretext served to mask unlawful discrimination. In effect, the plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Id.* (internal quotation marks omitted).

*Fischman v. Mitsubishi Chem. Holdings Am., Inc.*, No. 18-CV-8188 (JMF), 2023 WL 4763257, at *6 (S.D.N.Y. July 26, 2023); *see Szewczyk,* 2022 WL 2037196, at *2 ("'When a plaintiff seeks to prevent summary judgment on the strength of a discrepancy in qualifications ignored by an employer ... [her] credentials would have to be so superior to the credentials of the person selected for the job that no reasonable person,

in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'")(quoting *Byrnie*, 243 F.3d at 103).

Plaintiff fails to establish that her credentials for the Animal Care Assistant position, which the employer deemed to be primarily focused on the care of transgenic mice, were so superior to Mr. Guinther's credentials that no reasonable person, in the exercise of impartial judgment, could have chosen Mr. Guinther over Plaintiff for this position. Indeed, even when construing the evidence in the light most favorable to Plaintiff, she worked on two studies involving genetic mice a number of years ago (which Dr. Kontaridis was unaware of) whereas Mr. Guinther had ten years of experience in this realm and was vetted by MMRI's consulting veterinarian who opined that Guinther "ha[d] more experience than we could ask for."  As stated above, "the court must respect the employer's unfettered discretion to choose among qualified candidates," and the Court's role "is to prevent unlawful hiring practices, not to act as a 'super personnel department' that second guesses employers' business judgments." *Byrnie,* 243 F.3d at 103.  Plaintiff fails to present sufficient evidence that the decision to hire Mr. Guenther for the Animal Care Assistant position instead of her was made for reasons connected to Plaintiff's gender or age, or that it was in retaliation for her complaint against Mr. Zelinsky.

Next, Plaintiff claims the proffered reasons for her termination are pretextual because "multiple emails, regulatory compliance assurances, quarterly reports, building plans and surveys all indicate that" MMRI was planning to build both small and large animal facilities in 2017 and 2018. Plaintiff's MOL, at p. 20. Defendants assert that they do not and never have contested the fact that plans were initially drawn for both a full-

barrier small animal vivarium and a large animal facility. Kontaridis Dec., at ¶¶ 11-14; Zielinski Dec., at ¶¶ 7-9.  However, as they assert, the evidence indicates that as the renovation planning was underway, it became clear that MMRI could not simultaneously construct both a large and small animal facility. *Id.* Given the transition to small animal research, the small animal vivarium was prioritized and construction of the large animal facility was put on hold for several years. *Id.*; Kontaridis Dec., at ¶¶ 60.

Defendants correctly contend that while Plaintiff cites countless documents which contemplated the buildout of a large animal space in 2017 and 2018 (Plaintiff's MOL, at pp. 20-22), the undisputed record evidence indicates that construction of the large animal facility did not begin until December 2019 and was not complete until December 2020. Kontaridis Dec., at ¶ 60.  And, as Defendants assert, it was not until September 2021 that large animals were actually used at MMRI, and even then, only three pigs were on premises for the limited purpose of conducting a tutorial on how to conduct a pig study. *Id.* at 61. As Defendants argue, the fact that MMRI originally planned to construct a large animal facility in 2017 to 2018 is immaterial as that is not what occurred.

Plaintiff also asserts that the decision to terminate her instead of the other two Research Assistants in Jonathan Cordeiro, Ph.D.'s ("Dr. Cordeiro") lab was discriminatory because "Defendants chose to keep a male and terminate Plaintiff who was a female." Plaintiff's MOL, at p. 24.  Plaintiff overlooks the fact that two of three Research Assistants working in Dr. Cordeiro's laboratory were retained – Robert Goodrow, who is male, and Jackie Treat, who is female. Any inference of gender discrimination Plaintiff attempts to present based on the fact that Mr. Goodrow remained

employed is defeated by the fact that Ms. Treat, who like Plaintiff is female, was similarly retained.

Plaintiff also does not present evidence as to Ms. Treat's age, and therefore Plaintiff fails to raise any inference of age discrimination in the decision to terminate her Research Assistant position. This defeats any claim of pretext related to age. *See McGuire-Welch v. House of the Good Shepherd*, 720 F. App'x 58, 60 (2d Cir. 2018)("To carry her ADEA pretext burden, the plaintiff must prove age was the 'but-for' cause of the challenged employment action, *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010), and we have assumed, without deciding, that this standard also applies to age discrimination claims under the NYSHRL, *see id.* at 105 n.6."); *see id.* at n. 1 (Even if the Court applies "the lower Title VII standard and require[s] only that age was a 'motivating factor,' [the Court] would still conclude [plaintiff's] NYSHRL age discrimination claim fails.")(citing *Shultz v. Congregation Shearith Israel of the City of N.Y.*, 867 F.3d 298, 304 (2d Cir. 2017) (internal quotation marks omitted)).

In the end, Plaintiff has not demonstrated pretext on any of the bases she asserts in her opposition. She has not presented facts upon which a reasonable factfinder could conclude that Defendants' reasons for terminating her employment were false or that age and/or gender discrimination, or even retaliation, were the "real reason" for her discharge. *Isaac v. City of New York*, 701 F. Supp. 2d 477, 488 (S.D.N.Y. 2010) (quotations and citations omitted).  Likewise, Plaintiff has not presented facts upon which a reasonable factfinder could conclude that Defendants' reasons for hiring Mr. Guinther and not her for the Animal Care Assistant position were false or that age and/or gender discrimination, or even retaliation, were the real reason for this

employment decision.  Accordingly, the aspect of Defendants' motion directed to Plaintiff's discrimination claims is granted, and these claims are dismissed.

## V.      CONCLUSION

For the reasons discussed above, Defendants' motion for summary judgment, ECF No. 41, is **GRANTED**. The Clerk is respectfully directed to entered judgment for Defendants and close the file in this matter.

**IT IS SO ORDERED.**

Dated: September 28, 2023

Thomas J. McAvoy
Senior, U.S. District Judge